ANDREW J. BARNES, JR., a Minor, by ANDREW J. BARNES, His Next Friend, Plaintiffs in Error, v. HENRY L. LIEBIG, *et al.,* Defendants in Error. (Three Cases.)

1 So. (2d) 247
Division A
Opinion Filed February 25, 1941
Rehearing Denied April 10, 1941

220

*McCune, Hiaasen & Fleming* and *Fleming Bomar,* for Plaintiffs in Error;

*Knight, Pace & Paine* and *George J. Baya,* for Defendants in Error Henry L. Liebig, J. R. Ridley and Cathrine Ridley, joined by her husband, J. R. Ridley;

*Knight & Green,* for Defendants in Error Southeastern Management Company, Southeastern Greyhound Lines and Union Bus Company.

WHITFIELD, J.—It appears from the allegations of the declarations herein that on paved U. S. Highway No. 41. which is about eighteen feet wide, running north and south, in the State of Georgia, about two miles south of the Tennessee State line, there was a wooden bridge over Peavine Creek about eighteen and one-half feet wide and two hundred feet long; that about 9:30 A. M., September 3, 1936, a motor bus eight feet wide was going south crossing the bridge, while a Ford car was following about two hundred feet behind the bus.

A Cadillac car being negligently driven in excess of sixty miles an hour going north on the east travel lane of the highway, met the motor bus just south of the south end of the bridge, the bus going south and being run four feet on the east side of the middle line of the highway. The Cadillac car six feet wide going north on the east travel lane was turned to the right to avoid collision with the motor bus and ran off the pavement and onto the hard dirt shoulder of the paved road about fifteen feet south of the bridge and into the flexible steel guard railing which was about four feet from the east side of the paved road south of the bridge, and then turned towards the left, proceeding diagonally across the highway and bridge, and with great force

and violence collided with the Ford car which was following at a safe distance behind the motor bus. The Ford car going south was being run on the west travel lane on the bridge. The collision of the Cadillac with the Ford car seriously injured the wife and son, and also the Ford car, of Andrew J. Barnes.

Three actions were brought in the Circuit Court for Dade County against "both the owners and operators of the motor bus and those responsible for the Cadillac car, on the theory that the proximate cause of the injuries was the combined, concurring and contributing negligence of" those responsible for the operation of "the motor bus and the Cadillac car." The actions were brought in Dade County, Florida, where some of the defendants reside. Plaintiff resides in Broward County, Florida.

One action is by Andrew J. Barnes, the husband, to recover damages for the loss of the comfort, society, services and consortium of his wife; for the loss of the services of his son who was driving the Ford car at the time; for the medical, doctor, hospital and other bills expended for his wife and son, and for the damage done to plaintiff's Ford car. A separate action is by Pearl Barnes, the wife, to recover damages for her own injuries. A third action is by the son, Andrew Barnes, to recover for his own personal injuries. Plaintiff has made parties defendant both the owners and operators of the motor bus, and those alleged to be responsible for the operation of the Cadillac car, on the theory that the proximate cause of the action was the combined, concurring and contributing negligence in the operation of the motor bus and the Cadillac car.

The defendants are the same in all of the actions.

Some of the counts of the declaration are predicated upon a statute of the State of Georgia, others upon the common law.

A writ of error was taken in each case to a final judgment for defendants on demurrers sustained to the fifth amended declarations, the plaintiff declining to further amend. By stipulation of counsel the three cases on writs of error to this Court are considered as consolidated for the purpose of hearing and disposition here.

The last four assignments of error are as follows:

"PART 17

"Assignment of errors relating to plaintiff's fifth amended declaration as a whole, or certain general features thereof.

"193. The Court erred in ruling that plaintiff's fifth amended declaration failed to show that the proximate cause of the damages and injuries sustained by the plaintiff was the combined, concurrent and contributing negligence of the six defendants.

"194. The Court erred in ruling that the first, third, fifth, seventh, ninth, eleventh, thirteenth, and fifteenth counts of plaintiff's fifth amended declaration failed to state a cause of action because of the absence therefrom of the Georgia statutes governing the alleged tort.

"195. The Court erred in ruling that the transfer and conveyance of the assets of Southeastern Greyhound Lines, Inc., a Delaware corporation, to Southeastern Greyhound Lines, a Kentucky corporation, under the circumstances described in each count of the said amended declaration, failed to impose liability on Southeastern Greyhound Lines, a Kentucky corporation, for the torts of Southeastern Greyhound Lines, Inc., a Delaware corporation.

"196. The Court erred in ruling that the alter ego theory of liability as to the corporate defendants, as alleged in the fifth, sixth, thirteenth and fourteenth counts of plaintiff's fifth amended declaration, was insufficient in an action at law."

In substance it is contended here that the counts in each of

the fifth amended declarations sufficiently state a cause of action for damages upon the theory that the proximate cause of the injuries was the combined, concurring and contributing negligence in the operation of the motor bus and in the operation of the Cadillac car.

The declaration contains the following:

"6. That said highway, at said place, runs in a northerly and southerly direction and traverses Peavine Creek, over which a wooden bridge is constructed which forms a part of said highway; that said bridge was approximately two hundred feet in length; that on each side of the said highway, at the south end of the said bridge, there existed at said time a flexible steel guard or railing almost parallel with said pavement and situated about four feet from the pavement, and converging toward the south abutment of said bridge; that said bridge, at said time, was approximately eighteen and one-half feet wide; that said highway, at said time and place, was paved, which pavement was approximately eighteen feet wide; that on each side of said pavement there was a hard dirt shoulder about two feet wide; that said motor bus was approximately eight feet wide; that said Cadillac automobile was about six feet wide.

"7. At said time and place the said motor bus was being driven in a southerly direction in a negligent manner over said bridge and the south approach thereto and on the east side of the center or middle line of said highway and into and upon a portion (about four feet) of the east travel lane of said highway as it approached the said Cadillac automobile for meeting and passing. At said time and place the said Cadillac automobile was being driven in a northerly direction on said highway in a negligent manner as it approached the said motor bus and the said Ford automobile for meeting and passing near the south end of said bridge and at a high and dangerous rate of speed of over sixty

miles per hour and in utter disregard of the condition of said *locus in quo* and in utter disregard of the aforesaid circumstances of the approaching motor vehicles from the opposite direction. At said time and place the driver of said motor bus, as it approached said Cadillac automobile for meeting and passing, did not give to the driver of said Cadillac automobile an opportunity to pass it on the paved portion of said highway. At said time and place the driver of said motor bus, as it approached the said Cadillac automobile for meeting and passing, did not turn to the right of the center or middle of said highway so as to pass the Cadillac automobile without interference. At said time and place the driver of the Cadillac automobile did not reduce or slow down its speed as it approached the said bridge and said motor bus and the Ford automobile for meeting and passing. While meeting and passing the said motor bus, thus negligently driven upon a portion of the east travel lane, as aforesaid, the driver of the Cadillac automobile, while thus negligently driving as aforesaid, proceeded negligently to the right, off the paved portion of the east travel lane of said highway, onto the shoulder thereof, and into the east railing at a point about fifteen feet from the south end of said bridge and diagonally across the east travel lane of said bridge and highway and into the west travel lane of said bridge, where (at a point about 30 feet north of the south end of said bridge) with great force and violence, it struck the Ford automobile, whereby the Ford automobile was wrecked and demolished and its occupants were greatly injured and maimed. The direct and proximate cause of the said collision between the Cadillac automobile and the Ford automobile, as aforesaid, was the combined, concurring and contributory negligence of the driver of the Cadillac automobile, as aforesaid."

The declaration alleges that the "motor bus was being driven in a southerly direction in a negligent manner over

said bridge and the south approach thereto and on the east side of the center or middle line of said highway, and subsequently states other features of the operation of the bus that may be comprehended in "being driven in a negligent manner," if it was essential to allege such other features of the operation of the bus. The alleged manner of operating the motor bus is sufficiently alleged to have been negligently done. Likewise as to the allegations of negligence in the operation of the Cadillac car.

The declaration alleges:

". . . that on each side of the said highway, at the south end of the said bridge, there existed at said time a flexible steel guard or railing almost parallel with said pavement and situated about four feet from the pavement, and converging toward the south abutment of said bridge; that said bridge, at said time, was approximately eighteen and one-half feet wide; that said highway, at said time and place, was paved, which pavement was approximately eighteen feet wide; that on each side of said pavement there was a hard dirt shoulder about two feet wide; that said motor bus was approximately eight feet wide; that said Cadillac automobile was about six feet wide. . . . "And. . . .

". . . While meeting and passing the said motor bus, thus negligently driven upon a portion of the east travel lane, as aforesaid, the driver of the Cadillac automobile, while thus negligently driving as aforesaid, proceeded negligently to the right, off the paved portion of the east travel lane of said highway, onto the shoulder thereof, and into the east railing at a point about fifteen feet from the south end of said bridge and diagonally across the east travel lane of said bridge and highway and into the west travel lane of said bridge, . . ."

The above and other allegations of the declaration clearly indicate that the collision of the Cadillac car with the "railing," was not on the bridge. The Cadillac car "proceeded

negligently to the right, off the paved portion of the east travel lane of said highway, onto the shoulder thereof, and into the east railing at a point about fifteen feet from the south end of said bridge and diagonally across the east travel lane of said bridge and highway and into the west travel lane of said bridge, where" at a point about thirty feet north of the south end of said bridge, with great force and violence, it struck the Ford automobile, etc.

The bridge is a wood one and the two-foot hard dirt shoulder to the paved road and the "flexible steel guard or railing" are alleged to be on the sides of the paved road, the "flexible steel guard or railing" being about four feet from the pavement, and converging toward the south abutment of said bridge. The hard dirt shoulder of the paved road and the flexible steel guard or railing are not alleged to be on the bridge.

As the motor bus was running four feet on the east travel lane, leaving only five and one-fourth feet between the bus and the side of the bridge, the Cadillac car running north on the east travel lane could not have met the bus on the bridge without colliding with it. It clearly appears from the allegations of the declaration that the Cadillac car met the bus on the south approach to the bridge about fifteen feet from the south end of the bridge, and not on the bridge.

The declaration alleges that at the time and place alleged the "motor bus was being driven in a southerly direction in a negligent manner over said bridge and the south approach thereto and on the east side of the center or middle line of said highway and into and upon a portion (about four feet) of the east travel lane of said highway, as it approached the said Cadillac automobile for meeting and passing." This, in view of the approach of the Cadillac car, shows the motor bus "approximately eight feet wide" was being driven "in a negligent manner" while on the bridge which was approximately eighteen and one-half feet

wide, and also while on the southern approach to the bridge on which approach the paved highway was approximately eighteen feet wide. There were about five and one-fourth feet of the highway on each side of the bus while running on the bridge; and when running on the approach to the bridge there were five feet of the paved highway on each side of the motor bus with two feet of a hard dirt shoulder to the paved road and two more feet to the flexible steel guard or railing four feet from the paved part of the road, not on the bridge, making nine feet between the bus and the guard or railing with which the Cadillac car collided in passing the bus *on the approach to the bridge* "at a point about fifteen feet from the south end of said bridge."

If, when the six-foot Cadillac was approaching, the eight-foot bus had been turned to and driven on the west travel lane, it would have had one foot of paved road and two feet of hard dirt shoulder plus two feet to the guard railing on the right of the bus in passing southbound over the approach to the bridge when the bus met and passed the Cadillac car. This would have given the six-foot Cadillac car nine feet of paving, two feet of hard dirt shoulder plus two feet more to the guard railing on the approach to the bridge, which probably would have avoided the collision of the Cadillac car with the railing on the approach to the bridge, even though the Cadillac car was being negligently driven at an excessive and dangerous speed under the circumstances of the event. The eight-foot width of the bus and the eighteen-foot width of the paved highway made it the duty of the bus driver to exercise care commensurate with the dangers in meeting and passing all approaching motor vehicles on the relatively narrow highway, particularly on roads with guard railing and bridge approaches. Negli-gence of the Cadillac driver in approaching at excessive speed did not excuse the bus driver from exercising due

care; and when, as under the travel conditions in this case, negligence of the driver of the approaching car is apparent, it might require more care of the bus driver to conserve the safety of passengers and others.

The alleged negligence in operating the southbound bus on the portion of the east travel lane, proximately contributed to the alleged injuries, because without such negligent operation of the bus, the driver of the Cadillac car, though negligent, could reasonably have safely met and passed the bus if the bus had not been operated on four feet of the nine feet of the paved east travel lane on which the Cadillac was going north. Only five feet of paved road and two feet of hard dirt shoulder and two feet more between the bus and the guard railing were open to the speeding northbound Cadillac.

Negligence in operating the Cadillac car at a high and dangerous speed of over sixty miles an hour under the circumstances shown to then exist, proximately contributed to the alleged injuries, because even though the bus going south was being operated on four feet of the east travel lane on which the Cadillac was going north, the negligent operation of the Cadillac car six feet wide at excessive speed under the circumstances, naturally made it more difficult to avoid collision with the bus or with the guard railing.

For the safety of the traveling public the law required the exercise of more care by the drivers of the bus and the Cadillac car, than was done under the conditions then obvious to both drivers. Failure to exercise due care may be actionable negligence.

The operation of the forces of nature in the collision with the guard railing by turning the course of the rapid running Cadillac car so that because of its momentum from excessive speed it turned diagonally across the east travel lane to the west travel lane and caused the injuries to per-

sons who were not at fault in the premises. The presence or effect of an innocuous object or condition in the line of causation does not relieve either the bus driver or the Cadillac driver, or their principals, from the consequences of their negligence in contributing to the causes that proximately resulted in the injuries. See Janes v. City of Tampa, 52 Fla. 292, 42 So. 729; Benedict Pineapple Co. v. A. C. L. R. Co., 55 Fla. 514. 46 So. 732; Jacksonville, T. & K. W. Ry. Co. v. Peninsular L. T. & M. Co., 27 Fla. 157, 9 So. 661; Starling v. City of Gainesville, 90 Fla. 613, 106 So. 425; DeFuniak Springs v. Perdue, 69 Fla. 326, 68 So. 234; S. A. L. R. Co. v. Watson, 94 Fla. 571, 113 So. 716; Louisville & N. R. Co. v. Allen, 67 Fla. 257, 65 So. 8; Tel. Corp. v. Wallace, 104 Fla. 566, 140 So. 472; Wolfe Constr. Co. v. Ellison, 127 Fla. 808, 174 So. 594; Levenstein v. Maile, 146 Va. 789, 132 S. E. 844; Stuart v. Doyle, 95 Conn. 732, 122 Atl. 653.

The negligent operation of the southbound bus partly on the east travel lane, leaving only five feet of paved road, caused the Cadillac to be turned partially off the paved highway to avoid collision with the bus. In doing this the rapidly moving Cadillac was brought in collision with the flexible steel guard or railing four feet east of the paved highway, the natural effect of whcih collision was to force the speeding Cadillac to change its course and proceed diagonally across the east travel lane on the highway and to collide on the bridge with the southbound Ford car on the west traffic lane, injuring its occupants.

The concurring contributing negligence of the drivers of the bus and the Cadillac car were the efficient proximate causes of the injuries, the effect of the collision of the Cadillac car with the guard railing being the operation of a natural force and not an efficient cause of the injuries.

Negligence of the bus driver in running the bus four

feet on the east travel lane as the bus was approaching the Cadillac car south of the bridge, started the line of causation which, concurring with the negligence of the driver of the Cadillac car, proximately and efficiently caused the injuries complained of.

Negligence of the Cadillac driver proximately contributed towards the injuries by excessive speed and lack of due care when approaching and endeavoring to avoid collision with the bus, thereby causing a violent collision of the Cadillac car with the flexible steel guard or railing which caused the Cadillac car to change its course and injure the persons traveling south in the Ford car without their fault. This made actions for concurrent negligence that proximately caused injury, available to the injured parties.

The next question presented is whether it was necessary to allege in the declaration the Georgia statutes' or the Georgia common law, when suing in Florida for injuries alleged to have been sustained in Georgia.

This question refers particularly to Assignment of Error No. 194 already quoted herein. It is also applicable to the assignments of error under the odd numbered counts of plaintiff's declaration. Plaintiffs-in-error's brief admits that in these odd numbered counts the several plaintiffs were not relying upon any statute of Georgia, but upon the common law.

It has been held that the law of another state upon the subject matter in litigation is considered to be the same as the law of this State, until shown by due allegation and proof to be otherwise. Bemis v. McKenzie, 13 Fla. 553; Hagan v. Viney, 124 Fla. 747, 169 So. 391.

In 3 Beale—Conflicts of Laws 1683, Sec. 623.1, we find the following:

"The rule in many states is that the law of the sister state will be presumed to be similar to the common law of

the forum as it existed prior to statutory modification, or, as it is more commonly phrased, the law of a sister state is presumed to be the common law. This rule seems to have been adopted in Colorado, Georgia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina and Virginia. In an almost equal number of states the rule is that the law of the sister state will be presumed to be the same as the law of the forum. This includes statutes as well as the law established by judicial decision. This view seems to be law in Arizona, Arkansas, California, Idaho, Iowa, Kansas, Louisiana, Montana, Nebraska, New Mexico, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin and Wyoming. The third rule is a combination of the first two. As to those states which were formed from territory once under the political control of England there is a presumption that the law there is the common law unmodified by statute. As to the rest of the states there is no such presumption, and the court will apply the law of the forum. This seems to be the law in Alabama; and it was undoubtedly the rule of the Missouri courts prior to Rositzky v. Rositzky (329 Mo. 662, 46 S. W. [2d] 591)."

Thus we see that when law of a sister State is not pleaded in this State, a presumption is indulged in that the law of the sister State is the same as that of this State. There is no dismissal of the cause for failure to plead the law of the sister State, but the cause proceeds to ultimate conclusion under that presumption, unless by appropriate allegation and proof the contrary is shown.

The next question presented is: Where the Interstate ·Commerce Commission, pursuant to the Federal Motor Carriers Act of 1935, grants to one corporation permission to

merge with a second corporation on the condition that the second will assume all liabilities of the first; and in conformity therewith the first corporation (original tortfeasor) transfers all its assets and its franchise to the second corporation, and the first is dissolved, is the second corporation liable for a tort committed by the first corporation prior to the merger?

The declaration was filed against certain individual defendants and Southeastern Management Co., a Kentucky corporation, Southeastern Greyhound Lines, a Kentucky corporation, and Union Bus Co., a Florida corporation.

The first count of the declaration alleges in part:

"At said time and place (September 6, 1936), a motor bus, owned by Union Bus Company and Southeastern Greyhound Lines, Inc., a Delaware corporation, hereinafter called the Delaware Corporation, and operated by the Management Company, was proceeding on said highway in a southerly direction a short distance (estimated at about two hundred feet) ahead of the Ford automobile in which plaintiff, Pearl Barnes, was riding; that said motor bus was, at said time and place, being operated and driven by said Management Company, by and through its employee and servant acting within the scope of his authority and within the line of his duty; that the said motor bus, at said time and place, was operated by the Management Company, as agent of the Union Bus Company and the Delaware Corporation, acting within the scope of its authority.

"On or about November 12, 1936, the aforesaid Southeastern Greyhound Lines filed its application with the Interstate Commerce Commission of the United States, seeking authority to merge, under the provisions of the Federal Motor Carrier Act of 1935, the properties and operating rights of seven wholly owned subsidiary companies which included the Delaware Corporation. One of the conditions

of said application for merger was that the defendant, Southeastern Greyhound Lines, would assume and pay all liabilities of said Delaware Corporation, as well as of the other subsidiary corporations. On December 30, 1936, the Interstate Commerce Commission of the United States granted the aforesaid application, and, in pursuance thereto, all properties and operating rights of the said Delaware Corporation were transferred to and merged in the defendant, Southeastern Greyhound Lines, and, within a few days thereafter, the said Delaware Corporation was dissolved. On September 3, 1936, the Delaware Corporation was a wholly owned subsidiary of the defendant, Southeastern Greyhound Lines, and thereafter, as hereinabove alleged, the said Delaware Corporation was merged in the Southeastern Greyhound Lines, and all of its properties, assets and operating rights, including certificates of public convenience and necessity, were transferred and assigned to the Southeastern Greyhound Lines, upon the agreement that the Southeastern Greyhound Lines would assume all liabilities of the Delaware Corporation: that by virtue of the aforesaid, the defendant, Southeastern Greyhound Lines, became liable to the plaintiffs on the cause of action herein alleged against the Delaware Corporation. The assignments and agreements referred to in this paragraph are in possession of the corporate defendants, and plaintiffs do not have in their possession or control a copy thereof."

The other counts of the declaration contain these allegations of the last quoted paragraph by reference; or contain allegations of similar nature and import. The theory of the first quoted paragraph is varied in some of the counts.

A merger exists where one of the constituent companies remains in being, absorbing or merging into itself all the other constituent companies. 7 Fletcher-Cyclopedia of Corporations 8304, Sec. 4662. Where a merger takes place, the

subsisting corporation is answerable for the liabilities of the corporation which goes out of business. 15 A. L. R. 1138, note and cases cited. Where the corporation incurring liability ceases to have an independent existence *de jure,* the absorbing corporation is liable at law, as well as in equity, the ground for such liability being sometimes stated to be the continuance of the original corporation under a new guise, and sometimes to be an assumption of liabilities arising by implication. 11 L. R. A. (N. S.) 1120 note. In case of merger of one corporation into another, the latter is liable for the debts, contracts and *torts* of the former. 7 Fletcher-Cyclopedia of Corporations 8388, Sec. 4750. See also Polk County Lumber Co. v. Dwiggins, 100 Fla. 559, 129 So. 859; E. O. Roper, Inc., v. Wilson & Toomer Fertilizer Co., 116 Fla. 796, 156 So. 883; Mallory S. S. Co. v. Baker & Holmes Co., 117 Fla. 196, 157 So. 504.

Under these rules of law, it would appear that the allegation of the liability of the absorbing corporation for the tort of the constituent corporation is sufficient to require defendants to assert their defense on the merits.

The fourth and final question presented is whether liability of a corporation can be predicated on the alter ego theory in an action at law, or whether this doctrine is exclusively an equitable one.

This question refers to assignment of error number 196, and also to the assignments of error under counts 5, 6, 13 and 14 of the declaration.

The allegations of the fifth count of the declaration involved in this question are as follows:

"At said time and place, a motor bus operated by the Management Company, was proceeding on said highway in a southerly direction a short distance (estimated at about two hundred feet) ahead of the Ford automobile in which the plaintiff, Pearl Barnes, was riding; that fifty per centum

(50%) of the capital stock of said Management Company was, at said time, owned by the Union Bus Company, and the remaining fifty per centum (50%) of the capital stock of said Management Company was at said time owned by the Southeastern Greyhound Lines, Inc., a Delaware corporation, hereinafter called the Delaware Corporation; that said motor bus was engaged in the transportation of persons and property for compensation from Chattanooga, Tennessee, across the Georgia-Tennessee line to Atlanta, Georgia, and points south, over and across U. S. Route 41 Georgia State Route 3, via Ringgold, Dalton, Cartersville and Atlanta, Georgia; that the Management Company held no certificate of public convenience and necessity over the aforesaid route, as required by the Federal 'Motor Carrier Act 1935' (49 USCA, Sections 301, to 327, inc.); that at said time and place the Union Bus Company and the Delaware Corporation held the certificates of public convenience covering said route, as required by the said Federal 'Motor Carrier Act 1935'; that the said Management Company, in the operation of said motor bus over said route at said time, used the certificates of public convenience and necessity of the Union Bus Company and the Delaware Corporation; that said Management Company was so organized, operated, owned and controlled as to be the mere instrumentality, adjunct and simulacrum of the Union Bus Company and the Delaware Corporation; that at said time the said Management Company was the subsidiary and servient corporation, and the Union Bus Company and the Delaware Corporation were the dominant, owner and parent corporations, and the Management Company was in fact the mere alter ego of the Union Bus Company and the Delaware Corporation."

These allegations are likewise incorporated, either di-

rectly or by reference, in counts 6, 13 and 14 of the declaration.

In the case of Jefferson County Burial Society v. Cotton, 222 Ala. 578, 133 So. 256, an action at law was brought against the Jefferson County Burial Society and the Bradford Funeral Home for wrongful death. The Alabama Court in discussing whether one corporation could be the alter ego of another, said:

"Moreover, it is well settled that the legal fiction of distinct corporate existence may be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted as to make it merely an instrumentality or adjunct of another corporation. 14 C. J. 62, Sec. 25; Joseph R. Foard & Co. v. Maryland, 135 C. C. A. 497, 219 F. 827; McCaskill. Co. v. United States, 216 U. S. 504, 30 Sup. Ct. 386, 54 L. Ed. 590; Newport & Cincinnati Bridge Co. v. R. W. Wooley, 78 Ky. 523.

"While as a general rule the legal fiction of distinct corporate entity will be recognized and enforced to protect the corporation in the conduct of its business, the principle should not be carried so far as to enable the corporation to become a vehicle to evade just responsibility. McCaskill v. United States, *supra.*

"Under the evidence this principle was applicable, and presented a question for the jury as to whether the two defendant corporations were the mere 'business conduit and alter ego of each other,' or whether or not they were co-adventurers and under the same control. Davis v. Alexander, 269 U. S. 114, 46 Sup. Ct. 34, 70 L. Ed. 186; Berkey v. Third Ave. R. Co., 244 N. Y. 84, 155 N. E. 58, 50 A. L. R. 599, and note page 612."

This theory of corporate responsibility was involved in the case of Davis v. Alexander, 269 U. S. 114, 46 Sup. Ct.

34, 70 L. Ed. 186, in which the Supreme Court of the United States said:

". . . Where one railroad company actually controls another and operates both as a single system, the dominant company will be liable for injuries due to the negligence of the subsidiary company (citing cases)."

In the case of Bellaire Securities Corp. v. Brown, 124 Fla. 47, 168 So. 625, we quoted with approval from Professor Wormser's treatise on "Disregard of the Corporate Fiction," page 84, reading in part as follows:

"When the conception of corporate entity is employed to defraud creditors, to evade an existing obligation, to circumvent a statute, to achieve or perpetuate monopoly, or to protect knavery or crime, the courts will draw aside the web of entity, will regard the corporate company as an association of live, up-and-doing, men and women shareholders, and will do justice between real persons. This is particularly true in courts of equity, but finds *many illustrations in courts of law as well for it must not be thought that 'Our Lady of the Common Law,' is not sufficiently powerful to explode sophistry or scholastic theory where used as a cloak for wrongdoing."* (Emphasis supplied.)

It is apparent then that the theory of a subordinate or servient corporation being controlled by and being liable to a superior or dominant corporation for its acts, so that the latter could be held liable in an action at law for the negligence of the former, is in force in this State.

For the error in sustaining demurrers to the declarations involved in these three cases, each final judgment is reversed and each cause is remanded for further proceedings not inconsistent with the views herein expressed.

It is so ordered.

BROWN, C. J., BUFORD and ADAMS, J. J., concur.