446 So.2d 190 (1984)
The CHURCH OF SCIENTOLOGY OF CALIFORNIA, Appellant,
v.
Lionel BLACKMAN, M.D., the Committee for the Protection of Patients' Rights, and Laraine Shape, Appellees.
No. 81-473.
District Court of Appeal of Florida, Fourth District.
February 15, 1984.
Rehearing Denied March 26, 1984.
Terry L. DeMeo of DeMeo & Sherman, P.A., Coral Gables, Sanford M. Katz and Charlene M. Weinstein of Katz & Weinstein, P.A., and Joel B. Rudin and Richard Ware Levitt of Rudin & Levitt, New York City, for appellant.
Cone, Wagner, Nugent, Johnson, Hazouri & Roth and Jane Kreusler-Walsh and Larry Klein, West Palm Beach, for appellee-Lionel Blackman, M.D.
HURLEY, Judge.
This appeal arises from a defamation action. It presents a host of issues, but we conclude that appellant's threshold contention is both meritorious and dispositive: the plaintiff below failed to prove that one defendant-corporation dominated another so as to justify piercing the latter's corporate veil. Therefore, the judgment entered against the Church of Scientology of California, Inc., must be reversed.
The plaintiff, Dr. Lionel Blackman, is a psychiatrist who uses electro-convulsive *191 therapy (ECT or shock treatment). He is affiliated with the Banyan Psychiatric Institute in Lake Worth, Florida. One of the defendants, Laraine Shape, is an ordained minister, assistant guardian and president of the Church of Scientology of Florida, Inc., (The Florida Church). Additionally, she is a member of an entity known as the Committee for the Protection of Patients' Rights (CPPR) which was also named as a party-defendant. CPPR functioned for a period of time as a voluntary association and was incorporated on May 5, 1978. It opposes the use of electro-convulsive therapy for the treatment of mental illness. The third defendant, the Church of Scientology of California, Inc. (the California Church), is an incorporated branch of the Church of Scientology. Despite the California reference in its title, it maintains administrative offices in Clearwater, Florida.
The trial below involved two related occurrences. The jury, however, determined that defamatory statements were made on only one occasion: May 8, 1978, the day on which CPPR staged a demonstration at the Banyan Psychiatric Institute. On that day, approximately thirteen people picketed outside the hospital for about an hour. They carried placards, distributed leaflets and engaged in chanting  all condemnatory of Dr. Blackman's use of electro-convulsive therapy.[1] As a result of this incident, Dr. Blackman instituted suit against Laraine Shape, CPPR and the Church of Scientology of California, Inc.[2] His theory was that Laraine Shape made or assisted others in making defamatory statements, that she was an agent of CPPR and that CPPR, in turn, was an instrumentality or alter ego of the California Church. The jury accepted this theory and returned an interrogatory in which it expressly found that Laraine Shape was an agent or employee of the California Church at the time of the demonstration. Based on this finding, the jury returned verdicts against Shape, CPPR and the California Church. The trial court denied repeated motions for a directed verdict and various post-trial motions and, therefore, the California Church instituted this appeal.[3]
The evidence at trial established that Laraine Shape is an officer of the Florida Church. The plaintiff, however, adduced no proof to suggest that the Florida Church is dominated or controlled by the California Church. Consequently, the jury's finding that Ms. Shape was an agent or employee of the California Church can be sustained only if the evidence establishes an adequate legal relationship between Ms. Shape and CPPR and, then, between CPPR and the California Church. In other words, the California Church's liability in this case is predicated exclusively on Ms. *192 Shape's activity with CPPR and upon the premise that CPPR is an instrumentality or alter ego of the California Church. The record contains abundant evidence to support a finding that Ms. Shape acted as an agent of CPPR but, as detailed hereafter, there is no evidence to link CPPR to the California Church.
Viewing the testimony, as we must, in the light most favorable to the plaintiff, McDaniel v. Great Atlantic & Pacific Tea Co., 327 So.2d 893 (Fla. 3d DCA 1976), we find that Dr. Blackman established the following: (1) CPPR's incorporators are members of the Scientologist faith and attend the Tampa Mission in Tampa, Florida. (The record fails to disclose whether the Tampa Mission is affiliated with the California or the Florida Church or whether it has a separate corporate existence.) (2) When CPPR was formed, the California Church offered instruction on how to do public relations. (3) The California Church is listed as a sponsor on some CPPR material. (4) At one time, CPPR used a mailing address in a hotel owned by the California Church. (5) The California Church and CPPR are in "general agreement" in their opposition to electro-convulsive therapy. The question on appeal is whether the foregoing catalogue of evidence is legally sufficient to sustain the jury's implied finding that CPPR is an instrumentality or alter ego of the California Church so as to justify piercing CPPR's corporate veil.
Dr. Blackman resisted the Church's motion for a directed verdict by citing our decision in International Union of Operating Engineers, Local 675 v. Lassitter, 295 So.2d 634 (Fla. 4th DCA 1974), quashed on other grounds, 314 So.2d 761 (Fla. 1975). Lassitter upheld a jury's finding that an international union was responsible for the acts of its local union. In essence, the jury found that the local union was an instrumentality of the international. Our affirmance was partially predicated on the fact that the international's constitution specifically provided for its complete domination over the local. Without becoming enmeshed in the nuances of labor law and, in particular, those instances in which an international will be held accountable for the acts of its local, see generally Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), we believe that Dr. Blackman was correct in suggesting to the trial court that the concept of domination is critical to the resolution of this case.
Total domination, if established by competent evidence, will justify piercing a corporate veil. Vantage View, Inc. v. Bali East Development Corp., 421 So.2d 728 (Fla. 4th DCA 1982). In Dania Jai-Alai Palace, Inc. v. Sykes, 425 So.2d 594, 598 (Fla. 4th DCA 1982), we held that "when one corporation controls and dominates another corporation to the extent that the second corporation becomes the `mere instrumentality' of the first, the dominant corporation is liable for the torts of the subservient corporation." More recently, in Sisk v. General Builders Corp., 438 So.2d 65 (Fla. 4th DCA 1983), we stated that "[t]wo ostensibly separate corporations will be treated as one when it is established that one of the corporations totally dominates the other `to the extent that the subservient corporation manifests no separate corporate interest of its own and functions solely to achieve the purposes of the dominant corporation.'" (citation omitted). Thus, appellee is correct; domination is the central issue in this case.
Normally, the question of whether a corporation is an instrumentality or an alter ego of another corporation is an issue of fact for the jury. Barnes v. Liebig, 146 Fla. 219, 1 So.2d 247 (1941); Dania Jai-Alai Palace, Inc. v. Sykes, supra. However, "it is elemental that at the trial the burden of proof rests on the plaintiff to establish by competent evidence each material fact essential to recovery and that upon failure to do so it is the duty of the trial court upon appropriate motion to take the case from the jury and direct a verdict for the defendant." Smith's Bakery, Inc. v. Jernigan, 134 So.2d 519, 521 (Fla. 1st DCA 1961). Applying these rules to the case at bar, we hold that Dr. Blackman failed to *193 adduce competent evidence from which a jury could reasonably conclude that the California Church dominated CPPR. Indeed, the record is replete with uncontradicted evidence which suggests a contrary conclusion. Several witnesses testified that although the California Church agrees with the goals of CPPR, it does not exercise any actual control over CPPR. Furthermore, they testified that the California Church does not provide any financial support to CPPR and that CPPR has members who are not scientologists.
Viewing this evidence in the light most favorable to the plaintiff, we hold that there was a complete failure of proof on the all-important issue of domination. In fact, not one of the criteria listed in Dania Jai-Alai was satisfied.[4] Thus, the trial court erred in not granting the church's motions for a directed verdict. Accordingly, we reverse and remand with instructions to enter a final judgment in favor of the Church of Scientology of California, Inc.
REVERSED and REMANDED.
WALDEN, J., concurs.
DOWNEY, J., concurs specially with opinion.
DOWNEY, Judge, concurring specially:
I concur with both the result and reasoning of the majority opinion, but would also hold that a directed verdict should have been granted in favor of the California Church because appellee, a public figure, failed to adduce sufficient evidence of actual malice on the part of Loraine Shape regarding the allegedly defamatory statements. Thus, the California Church would not be liable to plaintiff even if Shape was an agent of CPPR and CPPR was an instrumentality or alter ego of the California Church. Under the prevailing view in many jurisdictions, a public figure plaintiff is required to meet the actual malice standard dictated by New York Times Co. v. Sullivan, 376 U.S. 254, 276-77, 84 S.Ct. 710, 723-24, 11 L.Ed.2d 686 (1964) irrespective of whether the publisher of the defamatory statement may be described as a media or non-media defendant. As the court stated in Rodriguez v. Nishiki, 653 P.2d 1145, 1149 (Hawaii 1982), wherein local entertainment personalities sued a candidate for public office:
Although at one time there was some dispute about whether the actual malice standard of liability would only be applicable to media defendants, it is now generally recognized, at least with regard to defamation actions involving public officials and public figures, that the New York Times standard of actual malice is applicable to both media and nonmedia defendants.
To like effect are: Avins v. White, 627 F.2d 637 (3d Cir.), cert. denied, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (former law school dean suing member of accreditation team which investigated the school); Woy v. Turner, 533 F. Supp. 102 (N.D.Ga. 1981) (agent of ball player suing team owner); Antwerp Diamond Exch. v. Better Bus. Bur., 130 Ariz. 523, 637 P.2d 733 (1981) (corporate seller of precious *194 stones and its president suing Better Business Bureau and others for statements concerning plaintiff's operations); Anderson v. Low Rent Housing Comm'n, 304 N.W.2d 239 (Iowa 1981), cert. denied, 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 621 (1981) (former city housing official suing city commission and city officials); Williams v. Pasma, Mont. 656 P.2d 212 (1982), cert. denied, ___ U.S. ___, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983) (former senate candidate suing state democratic committee member); Wheeler v. Green, 286 Or. 99, 593 P.2d 777 (1979) (professional horse trainer suing neophyte racehorse owners); Wollman v. Graff, 287 N.W.2d 104 (S.D. 1980) (police officer suing candidate for town council); but see Denny v. Mertz, 106 Wis.2d 636, 318 N.W.2d 141, 152-53 (1982). Moreover, requiring a public figure plaintiff to show actual malice as against a non-media defendant is not inconsistent with Florida law. See Gibson v. Maloney, 263 So.2d 632 (Fla. 1st DCA 1972).
NOTES
[1] The placards were varied. One stated: "Stop Unethical Psychiatry!"; another read: "Shock Treatment is Dangerous to Your Health!" A witness for the plaintiff testified that he saw Dr. Blackman's picture on one sign and that another said "Fire Dr. Blackman." The same witness testified that the marchers chanted: "Blackman, murderer, Blackman murderer," something about shock treatments being inhumane and that Dr. Blackman should be fired. The printed one-page leaflet was captioned: "What Goes on Behind the Closed Doors at Banyan Psychiatric Institute???????" It contained a drawing of a person receiving shock treatment. The following five statements appeared on single lines under the drawing: "Coercive Shock Treatment;" "Murder Reported as Suicide;" "Excessive Drugging;" "Locked `Quiet Rooms';" "Violation of Patient Rights." Next, the leaflet contained a picture of Dr. Blackman with this caption: "`It would be unreasonable to think that you could pass 170 volts of electricity through the brain without some damage ...' Dr. Lionel Blackman, Consulting psychiatrist Banyan Psychiatric Inst."
[2] The second amended complaint named four defendants, but only three are relevant to this appeal. The fourth defendant was Larry Slatkoff, an employee of the Church of Scientology of California, Inc. and a member of CPPR. It is fair to say that Mr. Slatkoff was the central figure in the trial below. He appeared on a radio program and discussed electro-convulsive therapy. Dr. Blackman claimed that Mr. Slatkoff defamed him during the broadcast. The jury, however, found that Mr. Slatkoff's statements were not defamatory.
[3] The Church of Scientology of California, Inc. is the only appellant before the court. Ms. Shape and CPPR also appealed, but both appeals were dismissed for lack of jurisdiction because they had been untimely filed.
[4] Dania Jai-Alai Palace, Inc. v. Sykes, supra at 599, quotes Fish v. East, 114 F.2d 177, 191 (10th Cir.1940), and lists some of the criteria which may be considered in determining whether a subsidiary is a mere instrumentality or alter ego of a parent corporation:

(1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.